IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RAYMOND JOSEPH HARRISON, | ) | CASE NO. 1:11CV00117 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Raymond Joseph Harrison ("Harrison") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g) and/or 42 U.S.C. § 1383.  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

Harrison contends that the Commissioner's finding that his impairments did not meet the

Listing for mental retardation,[1] as well as the Commissioner's finding as to his Residual

Functional Capacity ("RFC"), were not supported by substantial evidence.  For the reasons stated

below, Harrison is incorrect and the Commissioner's decision should be **AFFIRMED**.

## I.  Procedural History

Harrison filed an application for Disability Insurance Benefits and an application for

Supplemental Security Income Benefits on April 18, 2007, alleging a disability onset date of

January 1, 2006.  Tr. 113-117.  The state agency denied Harrison's claims initially on September

11, 2007 (Tr. 68-73) and upon reconsideration on December 28, 2007.  Tr. 78-82.  On January

---

[1] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

15, 2008 (Tr. 83-85), Harrison requested a hearing and, on February 24, 2010 a hearing was held

before Administrative Law Judge Dennis LeBlanc (the "ALJ").  Tr. 32-63.

In a decision dated April 7, 2010, the ALJ determined that Harrison was not disabled.  Tr.

13-31.  Harrison requested review of this decision by the Appeals Council and the Appeals

Council granted Harrison's two requests for time before acting on his request for review.  Tr. 6-

9, 12.  On November 15, 2010, the Appeals Council denied Harrison's request for review

making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.      Personal and Vocational Evidence

Harrison was born on April 5, 1984.  Tr. 113, 115.  His work experience includes:

laundry work in a hospital (Tr. 40-42, 140, 404), janitorial work at a gas station (Tr. 38-40, 404),

employment as a cook (Tr. 140), and maintenance work (Tr. 125, 140).  Harrison is a high school

graduate.  Tr. 37.  He attended special education classes throughout his school years.  Tr. 37.

Harrison lives in his grandmother's house with his grandmother, aunt, mom, dad and younger

brother.  Tr. 37-38.  He attempted to live on his own with a roommate but the arrangement lasted

only three months.  Tr. 38.

### B.      Medical Evidence

#### 1.      Medical evidence

##### a.      Treating Physician

On December 21, 2007, Phillip Tomsik, M.D. ("Tomsik"),[2] Harrison's treating

physician, completed a Mental Status Questionnaire including a Medical Source Statement

("MSS").  Tr. 309-311.  In response to questions regarding Harrison's insight and judgment,

---

[2] As of December 21, 2007, Tomsik noted that he first saw Harrison on June 1, 2006 and last saw him on November 13, 2007.  Tr. 309.

Tomsik noted that Harrison has indicated that he is afraid to leave the home because he might do something "bad."  Tr. 309.   Tomsik noted that Harrison has a history of bipolar disorder, anxiety disorder and schizoaffective disorder.  Tr. 310.

In the MSS Tomsik did not opine as to Harrison's ability to remember, understand or follow instructions, but Tomsik did opine that Harrison's ability to maintain attention is fair.  Tr. 310.  According to Tomsik, Harrison's ability to sustain concentration, persist at tasks, and complete them in a timely fashion is slow, i.e., slow completion due to anxiety, slowed speech and slow thought process.  Tr. 310.  Further, Tomsik opined that Harrison's social interaction and adaptation and ability to react to pressures are poor.  Tr. 310.

### b.  Consultative Physician

On August 9, 2007, Dr. Deborah Koricke, Ph.D. ("Koricke") conducted a consultative psychologist examination.  Tr. 285-290.  Harrison appeared pleasant and good-natured, and presented a good appearance.  Tr. 287-288.  Koricke noted that Harrison's hands trembled and he also appeared agitated and anxious.[3]  Tr. 288.  She indicated that Harrison showed good attention throughout the examination, with no signs of attention deficit.  Tr. 288.  Koricke noted that, when presented with hypothetical situations, Harrison responded with limited social judgment. Tr. 288-289.

Koricke administered the Wechsler Adult Intelligence Scale – III IQ tests ("WAIS-III). Tr. 285.  The Wechsler Adult Intelligence Scale – III  test results were Verbal IQ – 66; Performance IQ – 79; and Full Scale IQ – 69.[4]  Tr. 285.  According to Koricke, Harrison tested

---

[3] Koricke's report though also indicates that "claimant was not anxious when seen, and denies problems with anxiety."  Tr. 288.

[4] Mild mental retardation is associated with an IQ in the range of 50-55 to approximately 70.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 41. Borderline intellectual functioning is associated with an IQ in the 71-84 range.  *See* DSM-IV-TR at 740.

within the extremely low range of intellectual functioning.  Tr. 288.  However, it was Koricke's

opinion that, due to Harrison's tendency to give up on tasks that he viewed as difficult, the test

results were lower than they should have been.  Tr. 288.  Koricke estimated Harrison to be

functioning within the borderline range of ability and indicated that this estimate is consistent

with Harrison's grandmother's statement that Harrison has an IQ of 77.  Tr. 286, 289.

Koricke diagnosed Harrison with schizophrenia, paranoid type; borderline intellectual

functioning and a Global Assessment of Functioning (GAF) score of 55.[5]  Tr. 289.  She opined

that his ability to maintain attention, concentration, persistence and pace to perform simple

repetitive tasks is generally not impaired.  Tr. 290.  She opined that his ability to relate to others,

including fellow workers and supervisors, and his ability to understand, remember and follow

instructions is mildly impaired. Tr. 290.  She opined that his ability to withstand stress and

pressures associated with day-to-day work activity is moderately to markedly impaired due to

borderline intellectual functioning and schizophrenia.  Tr. 290.  More specifically, Korcike

opined that Harrison would experience difficulty understanding how to perform tasks and would

require a great deal of supervision and, as his psychotic symptoms increase, he would also suffer

additional decompensation that would dramatically impact his ability to understand and complete

job duties.  Tr. 290.

### c.  Agency Reviewing Physicians

On September 11, 2007, state agency reviewing psychologist Cynthia Waggoner, Psy. D.

("Waggoner") completed a psychiatric review technique form ("PRT") and a mental RFC.  Tr.

291-308.  In her PRT, Waggoner indicates that she did not find that Harrison's impairments met

---

[5] GAF considers psychological, social and occupational  functioning on a hypothetical continuum of mental health illnesses.  DSM-IV-TR at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

or equaled a Listing, but rather she found that an RFC assessment was necessary.  Tr. 291.  Also, in her PRT regarding Listing 12.05 (mental retardation) Waggoner opined that Harrison has borderline intellectual functioning.[6]  Tr. 295.  She further opined that Harrison has mild limitations with activities of daily living, moderate limitations in maintaining social functioning and in maintaining concentration, persistence or pace, and has had one or two episodes of decompensation of extended duration.  Tr. 301.

Waggoner opined that Harrison was only moderately impaired in his ability to withstand stresses of daily work and opined that Koricke's findings regarding Harrison's levels of impairment (including Koricke's finding that Harrison is markedly impaired in his ability to withstand stresses of daily work) are not consistent with objective evidence.  Tr. 307.  Waggoner further opined that Koricke's conclusions are not entirely consistent with Harrison's presentation and test scores, but Waggoner did provide some weight to Koricke's findings.  Tr. 307.  It was Waggoner's opinion that Harrison would do best in a setting with little or no demand for speed of deadlines and superficial contact with others.  Tr. 307.

### d.      Other physicians and/or assessors

#### *Michael Leach*

In November, 2009 and December, 2009, Michael Leach, Ph.D. ("Leach"), a clinical psychologist, evaluated Harrison.  Tr. 401-414.  Leach's evaluations were the result of a referral by Harrison's legal representatives.  Tr. 401.  Leach administered a number of tests (Tr. 407-411) and he opined as follows regarding the test results from those tests:

---

[6] Waggoner's report also includes findings relative to Listing 12.03 (Schizophrenic, Paranoid and Other Psychotic Disorders).  Tr. 293, 301. However, Plaintiff's arguments pertain to Listing 12.05.  Therefore, opinions relating to Listing 12.03 are not addressed herein.

- *Wechsler Adult Intelligence Scale – IV ("WAIS-IV")* – the test results from this test were Full Scale IQ – 71; Verbal Comprehensive IQ – 68; Perceptual Reasoning IQ – 90; Working Memory IQ – 69; and Processing Speed IG – 71. Tr. 407.  Leach opined that the results of the WAIS-IV are valid.  Tr. 407.

- *Wechsler Memory Scale – III -* Leach opined that the test results indicate that Harrison is functioning at the low end of the borderline range to impaired range in most areas of memory functioning.  Tr. 408.

- *Woodcock-Johnson III Tests of Achievement -* Leach opined that the test results indicate that Harrison's overall academic abilities are impaired and significantly lower when compared with his overall intellectual abilities indicating deficits in all areas of his academic functioning.  Tr. 408.

- *Integrated Visual and Auditory Continuous Performance Test ("IVA")*[7] - Leach opined that the test results indicate that Harrison is impaired in every area of the testing.  Tr. 410.

- *Motor - Bender Gestalt II -* Leach opined that the test results did not indicate any significant impairments, except that, on an immediate recall test, Harrison could produce only 3 of 12 figures.  Tr. 410. Leach opined that this result is indicative of impaired incidental learning.  Tr. 410.

---

[7] IVA is a test that measures sustained attention, focus, concentration and response control, and an individual's ability to stay focused on a task for a 15 minute period.  Tr. 409-410.

-   *Vineland Adaptive Behavior Scales -II* [8] - Leach opined that the test
    results indicate that Harrison has specific impairments in all areas, i.e.,
    communication, socialization and daily living skills.  Tr. 410.  Leach
    noted that, even though Harrison was 25 years of age at the time of the
    testing, Harrison's community daily living skills scores resulted in an
    age equivalent of 16 years, 5 months.  Tr. 410.  Also, he noted that
    Harrison's coping skills in the socialization subtest resulted in an age
    equivalent of 5years, 5 months.  Tr. 410.

-   *Personality Assessment Tests* - Leach opined that the validity of the
    test results from the three personality assessment tests[9] is questionable.
    Tr. 410-411.  Leach attributed this in part to the fact that the tests
    require more advanced reading and comprehension levels than
    Harrison may be capable of performing.  Tr. 410-411.   Leach did
    opine, however, that results from the personality tests indicated that
    Harrison was elevated on several of the clinical scales demonstrating
    depression, anxiety, affective disturbances relating to mood swings
    and several axis II[10] personality traits.

Leach summarized his findings and set forth his opinions regarding Harrison's activities

of daily living, social functioning, concentration, pace and persistence, episodes of

---

[8] The Vineland Adaptive Behavior Scales – II test involved Harrison's mother completing the Vineland to assess Harrison's adaptive behavior.  Tr. 410.

[9] The personality test assessments that were conducted included an MMPI-2, and MCMI-III, and a PAI.  Tr. 410-411.

[10] Axis II is one of five axes included in the DSM-IV multiaxial classification.  DSM-IV-TR at 27.  Axis II refers to personality disorders and mental retardation.  *Id.*

decompensation and work related functioning.[11]  Tr. 412-413.  Specifically, Leach opined that Harrison's ability to function on a daily basis is significantly impaired. Tr. 412-413.  He opined that Harrison's social functioning abilities are markedly impaired.  Tr. 413.   He also opined that Harrison demonstrated marked impairment in the area of concentration, pace and persistence. Tr. 413.  According to Leach, Harrison demonstrates marked impairment in the ability to handle the stress and pressure of day-to-day work.  Tr. 413.   Leach opined that Harrison's ability to appropriately relate to others in the workplace is markedly impaired.  Tr. 413.  According to Leach this impairment is related to depressive symptoms, agitation, poor frustration tolerance, limitations in intellectual functioning and personality issues with mixed traits.  Tr. 413-414. Further, Leach opined that Harrison's ability to understand, remember and follow directions is markedly impaired due to limitations in intellectual functioning as well as specific learning disorders and an attention deficit disorder.  Tr. 414.  Leach also opined that Harrison's ability to maintain concentration, persistence and pace is markedly impaired due to limitations in sustained attention, intellectual functioning and emotional disturbance with depression and panic attacks. Tr. 414.

Leach's specific diagnoses of Harrison include major depressive disorder, recurrent, moderate; panic disorder without agoraphobia; attention deficit hyperactivity disorder, combined type; reading disorder; mathematics disorder; disorder of written expression; polysubstance dependence – partial remission; borderline intellectual functioning; personality disorder NOS[12] – mixed traits; and a GAF assessment of 51, suggestive of moderate symptoms and moderate impairment in daily functioning.  Tr. 411-412.

---

[11] Leach's report also notes that, in July, 2005, Harrison was admitted to Southwest General Hospital for psychiatric treatment.  Tr. 402.  Records relating to this psychiatric admission are contained in the record.  Tr. 342-382.

[12] NOS refers to a "not otherwise specified" diagnosis.  DSM-IV-TR at 4.

### *Mary Frisina*

On January 14, 2010, Mary Frisina ("Frisina") of the MetroHealth Medical Center completed a vocational assessment of Harrison.  Tr. 208-213.  Frisina's assessment was the result of a referral by Harrison's legal representatives.  Tr. 208.  She opined that Harrison is unable to handle full-time, competitive employment.  Tr. 212.  Her bases for this opinion include the fact that he has been tested to function at the borderline level of intellectual functioning with no functional reading, writing or math skills, which according to Frisina rules out sedentary, desk work.  Tr. 212.  She further indicated that, when he was evaluated for physical dexterity and work speed, he performed below the competitive level and also reported back pain after standing for only 20 minutes.  Tr. 212.  Per Frisina, when these issues are added to Harrison's problems with depression, anxiety and insomnia, Harrison is not a candidate for full-time, competitive work.  Tr. 212.  She recommended a referral to the County Board of MRDD for assistance with case management services, i.e., money management, housing and sheltered work situation.  Tr. 213.

### C.    Testimonial Evidence

#### 1.    Harrison's  Testimony

Harrison testified regarding his education, living arrangements and work history.  Tr. 37-42.  He testified that he is a high school graduate and that he was in special education throughout his schooling.  Tr. 37.  He testified that he helps with chores at home, including sweeping and mopping the floor and taking out the garbage.  Tr. 52.  Harrison indicated that he goes to a number of different places outside the home, including his friends' houses, the doctors, AA meetings, and the store.  Tr. 47-51.  He testified that he leaves the house about twice each week to visit with friends.  Tr. 52.

He testified that, at the time of the hearing, he was working part-time at a Sunoco gas station where he cleans floors for about three hours a day, three days a week.  Tr. 38-39. Harrison testified that he does not interact with customers while working at the gas station.  Tr. 39.  Harrison indicated that his father and the owner of the gas station are good friends and his father assisted him in obtaining the job.  Tr. 39.  Harrison indicated that he has not had problems working at the gas station.  Tr. 40.  He testified that his mom or dad transports him to work or, if he has money, he sometimes takes the bus.  Tr. 40.

Harrison also testified about his prior work as a laundry worker at a hospital.  Tr. 40-42. He testified that he began his employment at the hospital while in high school and the position ultimately became a full-time position.  Tr. 40-41.  Initially, Harrison worked for approximately three months under the guidance of a coach before working independently at the position.  Tr. 41-42.  He testified that he worked at the hospital for approximately three years.  Tr. 42.  He indicated that, while working at the hospital, he had a nervous breakdown.  Tr. 40.

Harrison testified that he does not trust some of his family members.  Tr. 53. Specifically, he indicated he does not trust his older brother Mike because they do not get along with one another.  Tr. 53.  He also indicated that he does not trust his Aunt Karen who resides with him because he believes that she goes through his things.  Tr. 53.

The ALJ then inquired about Harrison's panic attacks.  Tr. 42-47.  Harrison testified that he cannot be around more than eight people before he starts freaking out and he is concerned that, if he returns to another full-time job, he will end up back in the hospital.  Tr. 42.  He testified that he did not have panic attacks prior to working at the hospital.  Tr. 45.  He testified that he has panic attacks approximately four times a day on days that he is out in public.  Tr. 46. In response to the ALJ's questions, Harrison testified that he does not have panic attacks while at

home.  Tr. 46.  However, he later testified, in response to questions from his counsel, that he does have panic attacks while at home.  Tr. 54.

Harrison explained that, when he is experiencing a panic attack, it feels as though a "150 pound dude" is sitting on his chest and he cannot breathe; he has to gasp for air.  Tr. 54.  He further stated that, if it is too hot, he has to go outside and walk around just to calm down before he goes back to wherever he is at the time of the panic attack.  Tr. 54.  Notwithstanding the medication that he takes, he testified that he still has problems with panic attacks.  Tr. 54.

Harrison also testified that he has problems sleeping even though he takes medication to help with sleeping.  Tr. 55-56.  He testified that there are some days that he just cannot sleep and other days where he cannot go to sleep until between two and four o'clock in the morning.  Tr. 55.  As a result, he naps during the day, sometimes for three to four hours at a time.  Tr. 55-56.

Harrison testified that he sees a doctor three times a month for his depression.  Tr. 47-48.  He testified that the medication that he takes helps with the depression and that he does not have any side effects from the medication.  Tr. 48.  He also testified that he goes to counseling.  Tr. 49.

### 2.    Vocational Expert's Testimony

Vocational Expert Brett Salkin ("VE") appeared and testified at the administrative hearing.  Tr. 58-62.  The ALJ requested that the VE only describe Harrison's laundry job at the hospital.  Tr. 60.  The VE testified that the laundry job is classified as a linen supply worker and that such a classification is an unskilled occupation, SVP2[13], and is customarily performed at a medium physical demand level.  Tr. 60.  The VE indicated that a linen supply worker position

---

[13] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2.  *Id.*

does not require contact with the general public but there would be more than occasional, i.e., more than one-third of the day, contact with co-workers.  Tr. 60.

The VE was asked whether there are any unskilled occupations existing in the national, regional or local economy that an individual could perform when considering the following assumptions: the individual is the same age as and has the same marginal educational level and the same work experience as the claimant; the individual is able to perform a full range of exertional work, however, the individual is limited to understanding, remembering and carrying out simple, routine tasks but not in a fast paced production environment such as an assembly line; the individual is limited to occasional interaction with co-workers throughout the work day; and the individual needs to work in a work setting that is not part of a general public area.  Tr. 61.  The VE provided the ALJ with three occupations that would be available in the national, regional or local economy to an individual with those limitations.  Tr. 61.  Specifically, the VE indicated that those jobs are a dish washer, warehouse worker, and janitor.  Tr. 61.  The VE noted that all three jobs are medium, unskilled occupations, and the VE testified as to the approximate number of jobs in the Cleveland, Ohio and National economy.  Tr. 61. The VE further testified that the reading requirement for these jobs is minimal, simple; specifically, for dish washer, there are no reading requirements and, for warehouse worker and janitor, there are checklist reading requirements.  Tr. 61-62.

Following the ALJ's questions, Harrison's counsel asked whether any jobs would be available to such an individual if the following limitations were added to the ALJ's hypothetical: the individual is constantly limited in his ability to understand, remember and follow directions, handle stress and pressure of day to day work, maintain attention and concentration for extended periods, complete a normal work day and work week without interruption from psychologically

12

based symptoms, and perform at a constant pace without an unreasonable number and length of rest periods.  Tr. 62.  The VE testified that he could not identify any jobs that would be available to an individual with those limitations.  Tr. 62.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant

work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his April 7, 2010 decision, the ALJ found that Harrison met the insured status requirement through June 30, 2011.  Tr. 18.  Notwithstanding the fact that Harrison worked after the alleged onset date of January 1, 2006, the ALJ found that Harrison had not engaged in substantial gainful activity since January 1, 2006.  Tr. 18.

The ALJ found that Harrison has the following severe impairments: bipolar disorder, schizophrenia, anxiety and borderline intellectual functioning.  Tr. 18.

The ALJ found that Harrison does not have an impairment or combination of impairments that meets or medically equals the criteria of Listings 12.03, 12.04, 12.05 or 12.06.[14]  Tr. 19-21.

The ALJ determined that Harrison has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional

---

[14] Listing 12.03 refers to schizophrenic, paranoid and other psychotic disorders.  20 C.F.R. pt. 404, Subpt. P , App. 1.  Listing 12.04 refers to affective disorders.  *Id.*  Listing 12.05 pertains to mental retardation.  *Id.* Listing 12.06 refers to anxiety related disorders.  *Id.*

14

limitations: he is limited to simple, routine tasks that are not performed in a fast-paced environment; he cannot perform assembly line work; he is limited to occasional interaction with co-workers; and he must work in a setting where he would not be exposed to the general public. Tr. 21-25.  Based on testimony from the VE, the ALJ determined that Harrison cannot perform any past relevant work.[15]  Tr. 25.

The ALJ determined that Harrison was born on April 5, 1984 and was 21 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date.  Tr. 26. The ALJ found that Harrison has at least a high school education and is able to communicate in English.  Tr. 26.  The ALJ determined that transferability of job skills is not material to the determination of disability.  Tr. 26.

The ALJ accepted the testimony of the VE as credible and found that, taking into consideration, Harrison's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Harrison can perform.  Tr. 26-27.

Finally, the ALJ found that Harrison had not been under a disability from January 1, 2006 through the date of the ALJ's decision.  Tr. 27

### V. Parties' Arguments

### A.    Plaintiff's Arguments

First, Harrison argues that the ALJ's finding of no listing level impairment under 20 C.F.R. Part 404, Supt. P, App. 1, Listing § 12.05C ("Listing 12.05C"), mental retardation, is not supported by substantial evidence.  Pl's Brief at 2, 8-14.  Harrison more specifically argues that the ALJ improperly invalidated Harrison's listing-level IQ scores (Pl's Brief at 9-10) and also erred in disregarding the listing-level scores.  Pl's Brief at 10-14.

---

[15] Although Harrison has past work other than that of a linen supply room work, in his Step Four analysis, the ALJ focuses only on the past work as a linen supply room worker.  Tr. 25.

Second, Harrison argues that the ALJ's finding as to Harrison's RFC is not supported by substantial evidence because it conflicted with the experts' opinions and with Harrison's job experience, and the sole bases for the ALJ's finding were speculative inferences relating to Harrison's leisure activities. Pl's Brief at 2, 14-18. Harrison more specifically argues that the evidence establishes that Harrison suffers from constant impairments in understanding, remembering and following instructions. Pl's Brief at 14-16. Harrison further argues that the evidence also establishes that Harrison suffers from constant impairments in handling stress and the pressure of day-to-day work and in sustaining a constant pace. Pl's Brief at 16-18.

**B.     Defendant's Arguments**

The Commissioner first argues that the ALJ reasonably found that Harrison does not meet Listing 12.05C. Def's Brief at 9. More specifically, the Commissioner argues that the ALJ reasonably found that the IQ scores, in the tests administered by Drs. Koricke and Leach, were not valid, and further that Harrison failed to demonstrate that he has deficits in adaptive functioning. Def's Brief at 9-12.

Second, the Commissioner argues that substantial evidence supports the ALJ's RFC. Def's Brief at 12. More specifically, the Commissioner argues that the ALJ reasonably rejected Dr. Leach's opinion that Harrison is markedly impaired in his ability to understand, remember and follow directions because that opinion is contradicted by other substantial evidence; i.e., Harrison's work experience and ability to perform a wide range of daily activities. Def's Brief at 13-15. Further, the Commissioner contends that the ALJ gave good reasons for his rejection of opinions that Harrison is unable to handle the stress and pressure of day-to-day work or maintain constant pace and that said rejection is supported by substantial evidence. Def's Brief at 15-16.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence, or indeed, a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Harrison v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.    The ALJ's determination that Harrison's impairments do not meet or equal Listing 12.05C is supported by substantial evidence.**

Listing 12.05 relates to mental retardation. To meet Listing 12.05C, a claimant has the burden to show the following:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22, [*and*]

. . . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Part 404, Subpt. P, App. 1, Listing §12.05C (emphasis added).

Harrison argues that the ALJ improperly invalidated or disregarded "listing-level" IQ scores on the tests administered by Drs. Koricke and Leach,[16] and therefore, the ALJ's findings are not supported by substantial evidence.[17] Harrison is incorrect. Significantly, neither Koricke nor Leach diagnosed Harrison with mental retardation. Rather, they diagnosed borderline intellectual functioning. Tr. 289 (Koricke), Tr. 411-412 (Leach). Substantial evidence, including Koricke's own opinion that Harrison's score was below his actual IQ, supports the ALJ's determination that the IQ test results were not valid. In making that determination, the ALJ took into account both medical and non-medical evidence. (Tr. 20-21). The ALJ considered the fact that Harrison had held a full-time laundry position at a hospital from 2000 to 2004. Tr. 20. Further, the ALJ considered Harrison's daily activities including performing normal household chores, riding public transportation, socializing with friends, camping, playing video games, attending AA meetings, as well as the fact that Harrison has not had any difficulties

---

[16] Harrison also cites scores on tests administered before his alleged onset date as well as an August 2010 Addendum to Leach's Psychological Evaluation ("Addendum") addressing the overall consistency of Harrison's IQ scores over time (Tr. 416). The Addendum was not part of the record before the ALJ. Since Plaintiff has not requested a remand under sentence 6 of 42 U.S.C. § 405(g) for consideration of this evidence, such evidence may not be considered. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Moreover, even if the Addendum was considered, it would not assist Harrison. Leach indicated that, when all IQ scores are considered, Harrison's mean FSIQ would be 71.4 (Tr. 416). As previously noted, an IQ within the range of 71-84 is associated with borderline intellectual functioning, not mild mental retardation, and an IQ score over 70 does not satisfy Listing 12.05C. *See* DVM-IV-TR at 41, 740; 20 C.F.R. pt. 404, Subpt. P, App. 1.

[17] The focus of Harrison's argument is that the IQ scores are valid and satisfy 12.05C. Harrison does not specifically address how he satisfies the diagnostic description in the introductory paragraph of Listing 12.05. To qualify as disabled under Listing 12.05, a claimant needs to satisfy both the diagnostic description in the introductory paragraph of the Listing and one of the four sets of criteria found in Subparts A through D. 20 C.F.R. §§ 404.1525(c)(3) and 416.925(c)(3); *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001).

interacting with medical professionals, or responding appropriately during an hour-long hearing. Tr. 20.

The ALJ's consideration of both medical and non-medical evidence in evaluating the IQ scores was appropriate.  "The regulations do no limit the question of validity [of IQ scores] to test results alone in isolation from other factors." *Albright v. Astrue*, 2011 U.S. Dist. LEXIS 117768, *29 (N.D. Ohio 2011) (citing *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 269 (6th Cir. 1991)).  "In assessing the validity of a claimant's IQ, information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living, social functioning, concentration, persistence and pace; or ability to tolerate stress."[18]  *Id. See Brooks v. Astrue*, 2010 U.S. Dist. LEXIS 27583, * 11 (N.D. Ohio 2010) (recognizing that factors outside the test itself, including daily activities and past work experiences, may be considered when determining the validity of an IQ score).

Koricke specifically opined that Harrison's IQ was lower than expected because of his tendency to give up on tasks that he viewed as difficult and Koricke estimated Harrison was actually within the borderline range of intellectual ability, which Koricke opined is consistent with Harrison's grandmother's report of an IQ of 77.  Tr. 289.  The ALJ accepted this opinion and determined that Harrison's IQ is too high to meet Listing 12.05C. Tr. 20.  Further, although Leach's test results included two scores within the 60 to 70 range,[19] the ALJ also found these scores were not valid.  Tr. 20.  The ALJ based his finding on the fact that Leach's report is inconsistent as well as on the fact that a review of the entire record shows that Harrison functions at a much higher level than Leach opined.  Tr. 20.  As evidence of the inconsistencies within

---

[18] Harrison does not dispute that IQ scores may be invalidated if there is substantial evidence in the record to support a finding that the scores are inconsistent with the claimant's daily activities and behavior.  Rather, he argues that there is not substantial evidence to support the ALJ's decision to invalidate the IQ scores.  Pl's Brief at 11.

[19] Verbal Comprehensive – 68 and Working Memory -69.  Tr. 407.

Leach's report, the ALJ points out that, while Leach states that Harrison put forth consistent effort, Leach then states that Harrison was frustrated and tired during the testing.  Tr. 20.  *See Albright*, 2011 U.S. Dist. LEXIS 117768 at *30 (finding no error where the ALJ found IQ scores to not be valid in part because a physician stated that the claimant's motivation and effort during testing was poor).

Citing *Kennedy v. Astrue*, 247 F. Appx. 761, 766 (6th Cir. 2007)*,* Harrison argues that the ALJ improperly used a GAF score to invalidate a listing-level IQ score. Pl's Brief at 11.  *Kennedy* states that GAF scores are not raw medical data and do not necessarily indicate improved symptoms or mental functioning.  Here, the ALJ did not use Harrison's GAF score as raw medical data but, rather, considered it in connection with a review of Leach's opinions and used it to explain why he determined that portions of Leach's opinions that appear to fall into listing level are inconsistent and not entitled to weight.  In other words, the ALJ found that Leach's findings of marked limitations are inconsistent with the GAF score of 51 determined by Leach, which is indicative of only moderate mental limitations.  Tr. 20.

Harrison relies upon *Halloway v. Astrue*, 2009 WL 5210837 (E.D. Ky. 2009), to support his argument that the ALJ improperly invalidated Listing-level IQ scores and erred by not obtaining a medical advisor to address the validity of the IQ scores.  *Halloway* is inapposite because, in that case, the medical examiner ultimately diagnosed the claimant with mild mental retardation.  *Id.*  Here, although Leach opined that the results of the WAIS-IV were valid, Leach did not diagnose Harrison with mental retardation.  Tr. 407.  Leach's diagnosis was borderline intellectual functioning, not mental retardation.  Tr. 411.  Also, Koricke did not diagnose Harrison with mental retardation.  Tr. 289.  *See Cooper v. Comm'r of Soc. Sec.*, 217 Fed Appx. 450, * 452 (6th Cir. 2007) (drawing a distinction between a diagnosis of mental retardation and

20

borderline intellectual functioning); *see also Brooks*, 2010 U.S. Dist. LEXIS 27583, * 17 (finding that a divergent diagnosis, while not dispositive, is relevant evidence when considering whether an IQ score is valid).

An ALJ is not required to call a medical expert.  *Davis v. Chater*, 1996 U.S. App. LEXIS 33614, *6 (6th Cir. 1996) (citing 20 C.F.R §§ 404.1527(f)(2), 416.927(f)(2)).  Where an ALJ has not abused his or her discretion, failure to call a medical expert does not preclude a court from finding substantial evidence to support an ALJ's decision.  *Id.*  Where the record contains sufficient evidence for an ALJ to decide a disability claim absent expert medical testimony, a failure to solicit expert medical testimony will not serve as a basis to reverse an ALJ's decision. *See Williams v. Callahan*, 1998 WL 344073, *4 n. 3 (6th Cir. 1998) (finding that because the record contained the claimant's extensive medical history, the ALJ did not err in not soliciting expert medical testimony).  Here, the record contains sufficient evidence for the ALJ to have decided Harrison's disability claim.  Therefore, the ALJ cannot be said to have erred in not calling a medical expert in this case.

Based on the foregoing, Harrison's argument that the ALJ improperly invalidated or disregarded Listing-level IQ scores is without merit.

**B.      The ALJ's RFC Finding is supported by substantial evidence.**

The ALJ determined that Harrison has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to simple, routine tasks that are not performed in a fast-paced environment; he cannot perform assembly line work; he is limited to occasional interaction with co-workers; and he must work in a setting where he would not be exposed to the general public. Tr. 21-25.  Harrison argues that the ALJ improperly discounted opinions regarding the severity

of his impairments in ability to understand, remember and follow instructions and in his ability to handle stress, the pressure of day-to-day work and maintain a constant pace.  Pl's Brief at 14. Harrison concludes that the ALJ's RFC is not supported by substantial evidence.  Pl's Brief at 2.

The Regulations provide that the Commissioner assesses a claimant's RFC "based on all of the relevant medical and other evidence."  20 C.F.R. § 404.1545(a)(3).  Limitations in "ability to carry out certain mental activities, such as limitations in understanding, remembering and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce" a claimant's "ability to do past work and other work." 20 C.F.R. § 404.1545(a)(5)(c).  "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  The responsibility for determining a claimant's residual functional capacity rests with the ALJ. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c); 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2).

Leach opined that Harrison's ability to understand, remember and follow directions is markedly impaired due to limitations in intellectual functioning as well as specific learning disorders and an attention deficit disorder; that he has a marked impairment in his ability to handle the stress and pressure of day-to-day work; and that his ability to maintain concentration, persistence and pace is markedly impaired due to limitations in sustained attention, intellectual functioning and emotional disturbance with depression and panic attacks.  Tr. 413-414. However, the ALJ determined that Leach's opinions are contradicted by and inconsistent with other evidence of record and therefore are entitled to little weight.  Tr. 24-25.  The ALJ determined that Harrison's wide range of daily activities, including camping, playing video games, attending AA meetings at least three times a week, visiting with friends at least twice a

22

week, his ability to have maintained both full-time work at a hospital and part-time work at a gas station with no indication that he had problems interacting with co-workers or supervisors, his ability to complete his work tasks independently, and his ability to relate to, understand and respond appropriately to treating professionals are in contradiction to Leach's opinions.  Tr. 24-25.  Therefore, the ALJ gave little weight to Leach's opinions regarding Harrison's limitations.  Tr. 24-25.

As noted by the Commissioner, reports of one-time examining physicians are not entitled to treating physician deference.  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  Leach was not a treating physician.  His evaluation of Harrison was the result of a referral from Harrison's legal representatives and he saw Harrison on only two occasions.  Tr. 401.  The rationale for applying special deference to treating physicians, i.e., that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant, does not apply to Leach's opinions in this case.  *Id.*  The ALJ's decision to not provide weight to Leach's opinions is supported by substantial evidence.

Koricke opined that Harrison's ability to withstand stress and pressures associated with day-to-day work activity is moderately to markedly impaired due to borderline intellectual functioning and schizophrenia.  Tr. 290.  The ALJ gave this one opinion of Koricke no weight.  Tr. 23.  The ALJ determined that Koricke's opinion regarding Harrison's ability to withstand stress and pressure associated with day-to-day work activity is inconsistent with the claimant's ongoing work activity, with his prior work and with his wide range of daily activities.  Tr. 23.  Additionally, Waggoner, the state agency reviewing psychologist, opined that Koricke's opinion

that Harrison's ability to withstand stresses of daily work was markedly impaired is inconsistent with objective evidence.[20]  Tr. 307.

Koricke was not a treating physician.  Accordingly, the rationale for applying special deference to treating physicians does not apply to her opinion regarding Harrison's ability to withstand stress and pressure associated with day-to-day work activity.  *See Barker*, 40 F.3d at 794.  The ALJ's decision to not provide weight to this opinion of Koricke is supported by substantial evidence.

Tomsik opined that Harrison's task completion rate would likely be slow and his ability to adapt is poor.  Tr. 310.  While the ALJ gave weight to Tomsik's opinion regarding Harrison's ability to sustain attention because he found that opinion to be supported by the objective evidence of record, he gave little weight to Tomsik's opinions that Harrison would be slow to complete tasks and that Harrison's ability to adapt is poor.  Tr. 24.  The ALJ based his decision to give little weight to these opinions of Tomsik on the fact that there is evidence that Harrison: plays video games, assembles model cars and rides a bicycle; never lost a job based on how he relates to others; attends AA meetings frequently without difficulty; and sustained his part-time job for over a year without difficulty and with no particular accommodation or assistance.  Tr. 24.

Substantial evidence likewise supports the ALJ's decision to give little weight to treating physician Tomsik's opinions as to Harrison's ability to complete tasks and to adapt.  The opinions of a treating source are entitled to controlling weight if the ALJ determines that the opinions are well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record.  *Wilson v.*

---

[20] With the exception of Waggoner's opinion on daily activities, the ALJ gave great weight to Waggoner's opinions. Tr. 23.

*Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2).   Here, the

ALJ determined that Tomsik's opinion as to Harrison's ability to complete tasks and adapt was

inconsistent with other substantial evidence.  Tr. 23.  Accordingly, the ALJ declined to give

controlling weight to Tomsik's opinion as to Harrison's ability to complete tasks and to adapt.

Tr. 23.  Nevertheless, the RFC established by the ALJ reflects the fact that the ALJ did give

some weight to Tomsik's opinions.  Specifically, the RFC provides in pertinent part that

Harrison is limited to simple, routine tasks *that are not performed in a fast-paced environment*

and *he is limited to occasional interaction with co-workers; and he must work in a setting where*

*he would not be exposed to the general public.*  Tr. 21.

Harrison also relies on Frisina's vocational assessment report.  Pl's Brief at 18.  Inasmuch

as Frisina is not a treating physician, her opinions are not entitled to special deference.  *See*

*Barker*, 40 F.3d at 794.  Harrison also relies on a letter from Charles Jacobs, Harrison's employer

at the gas station, to argue that Harrison's part-time job undermines rather than supports the

ALJ's decision.  Pl's Brief at 15.  However, Mr. Jacobs' letter was submitted as new evidence

and, since Plaintiff has not requested a remand under sentence 6 of 42 U.S.C. § 405(g) for

consideration of this evidence, such evidence may not be considered.  *See Cotton,* 2 F.3d at 696.

"Substantial evidence is more than a scintilla of evidence but less than a preponderance

and is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Besaw*, 966 F.2d at 1030.  Here, substantial evidence supports the ALJ decisions

regarding what weight to give the opinions of the various physicians.  Harrison's attempt to show

that substantial evidence exists to support a contrary result is without avail because, even if

substantial evidence or, indeed, a preponderance of the evidence supports a claimant's position, a

reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Harrison,* 336 F.3d at 477.

## V.  Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: January 3, 2012

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).